UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

__Gloria Gean Fischer__

    **v.**                                    Civil No. 13-cv-00463-PB
                                              Opinion No. 2014 DNH 227
__Carolyn Colvin,__
__U.S. Social Security Administration,__
__Acting Commissioner__


__MEMORANDUM AND ORDER__


        Gloria Gean Fischer seeks judicial review of a ruling by

the Commissioner of the Social Security Administration ("SSA")

denying her application for Disability Insurance Benefits

("DIB").  For the reasons I discuss below, I conclude that the

Administrative Law Judge ("ALJ") erred by failing to consult a

medical advisor before determining that Fischer was not disabled

as of her date last insured.  Thus, I vacate the Commissioner's

decision and remand for further administrative proceedings.


                    I.  __BACKGROUND__[1]

A.      __Relevant Medical and Other Documentary Evidence__

        Fischer was 41 years old when her insured status expired on

---

[1] Sections A and B of the background section are taken
substantially from the parties' Joint Statement of Material
Facts (Doc. No. 10).  __See__ L.R. 9.1(b).  Minor stylistic and
substantive changes have been made, and citations to the
administrative transcript have been omitted.

March 31, 1998, and she was 56 years old on June 28, 2013, when the ALJ denied her claim.  Fischer has a GED and she previously worked as a hairdresser, a retail store owner, and an operator of a small basket-making company.

    1.   <u>Medical Evidence</u>

On October 1, 1996, Fischer visited the Exeter Hospital Pain Clinic complaining of increasingly severe left buttock and left leg pain that began when she was injured after a fall in June 1996.  The pain was worse with standing or sitting, and it woke her up at night.  She also described transient paresthesias[2] in L4-5 and S1[3] distributions.  On examination, Fischer had full range of motion in the lumbar spine,[4] tenderness in the spinous process in T2-T5[5] and at L4-5, and unusual paraspinal tenderness.

---

[2] Paresthesia is an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus.  <u>Dorland's Illustrated Med. Dictionary</u> (Dorland's) 1404 (31st Ed. 2007).

[3] The symbols L4 and L5 refer to two of the five vertebrae that comprise the lumbar vertebrae, which are the five vertebrae between the thoracic vertebrae and the sacrum, a wedge-shaped bone lodged between the two hip bones.  <u>Dorland's</u>, <u>supra</u> note 2, at 1362, 2079.  The symbol S1 refers to one of the five fused sacral vertebrae that form the sacrum.  <u>Id.</u> at 1362.

[4] The lumbar spine is that portion of the spine comprising the lumbar vertebrae.  <u>Dorland's</u>, <u>supra</u> note 2, at 1774.

[5] The symbols T2 and T5 refer to two of the twelve vertebrae that comprise the thoracic vertebrae, which are situated between the

She had good flexion and extension of her lower extremities, and she was able to toe and heel walk.  Straight leg raise testing was positive at 90 degrees on the right and left.  An MRI showed a bulge at L4-5.  The attending physician diagnosed Fischer with sciatica[6] secondary to lumbar strain and administered an epidural steroid injection.[7]  On January 6, 1998, Fischer underwent an MRI of her cervical spine to assess neck pain that was radiating to her left shoulder.  The MRI was normal.

Fischer's insured status expired on March 31, 1998.

In October 1998, Fischer underwent an X-ray of her left hip and pelvis to rule out a bone abnormality or sacroilitis.[8]  That

---

lumbar and cervical vertebrae, giving attachment to the ribs and forming part of the posterior wall of the thorax.  They are designated by the symbols T1 through T12.  Dorland's, supra note 2, at 2079.

[6] Sciatica is a syndrome characterized by pain radiating from the back into the buttock and into the lower extremity along its posterior or lateral aspect, and most commonly caused by protrusion of a low lumbar intervertebral disk; the term is also used to refer to pain anywhere along the course of the sciatic nerve.  Dorland's, supra note 2, at 1703.

[7] "Epidural" means situated upon or outside the dura mater, which is the outermost, toughest, and most fibrous of the three membranes covering the brain and spinal cord.  Dorland's, supra note 2, at 580, 639.

[8] Sacroiliitis is inflammation in the sacroiliac joint, which is located between the sacrum (the triangular bone just below the

study was also normal.

On March 31, 2004, Fischer visited Dr. Frank Graf, complaining of poor results from epidural blocks.[9]  On examination, Fischer exhibited marked sensitivity in the sciatic notch on her left side, and she also had pain on passive range of motion of the hip joints.  Dr. Graf noted that her X-rays and MRIs did not indicate any hip joint problem or sacroiliac joint problem, and her MRI of the lumbar spine suggested some degenerative disc changes with annular bulge but no disc herniation.[10]  He recommended a pelvic examination with her internist, Dr. Braese, and an appointment with a physical therapist.

On May 27, 2004, Fischer underwent a physical therapy evaluation for a questionable diagnosis of piriformis syndrome[11].

---

lumbar vertebrae) and ilium (the expansive superior portion of the hip bone).  Dorland's, supra note 2, at 1362, 1687.

[9] An epidural block is regional anesthesia produced by injection of the anesthetic agent into the epidural space.  Dorland's, supra note 2, at 230.

[10] Herniation is the abnormal protrusion of an organ or other body structure through a defect or natural opening in a covering, membrane, muscle, or bone.  Dorland's, supra note 2, at 862.

[11] Piriformis syndrome is compression of the sciatic nerve by the piriformis muscle, causing pain.  The Merck Manual 2635 (18th

Under the History section of the report, it was noted that Fischer had fallen off of a ladder seven years earlier onto her left hip with a twisting motion as she fell, and she had experienced problems with her left buttock and leg ever since. She had been treated with physical therapy, which did not help a great deal.  Fischer complained that over the preceding few days she felt a constant pain in the left buttock and down into the lateral aspect of the leg, which she rated at a 7 on a scale of 0-10.  While attempting to work out the pain, she had also been experiencing numbness and tingling in her left arm.  She also noted that she began taking Ambien during the past week because the pain was making it difficult for her to sleep.  The therapist administered a number of specific low back tests, including a piriformis test that yielded a "markedly positive" result on her left side and a straight leg raise that was positive for left lower back burning.

On August 14, 2004, Fischer underwent an MRI of the lumbar spine to evaluate complaints of left flank pain that radiated to the left leg.  Fischer then underwent a second MRI of the lumbar spine on December 15, 2005.

---

Ed. 2006).

On December 7, 2006, Fischer underwent an operation to implant a dual Octrode lead for a spinal cord stimulation trial.

On September 4, 2009, Fischer's treating primary care physician, Dr. Braese, noted that Fischer reported to him that she had two jobs and was happy and active.

In 2010, Fischer began to regularly visit the Rye Interventional Spine Medicine seeking treatment for her back, leg, and foot pain.  At these visits, Fischer would usually complain of a persistent pattern and history of back and left-sided leg and foot pain that had originated around 1995 and 1996.  For example, during her April 20, 2011 visit, Fischer complained of low back pain that had been occurring in a persistent pattern for 15 years without change.  She described the pain as a moderate to severe dull aching in the lower back, left flank area, left buttock, and left dorsal foot.  The pain, Fischer said, radiated to the lateral aspect of her left leg and left foot.  The back pain was aggravated by sitting.

Additionally, the Rye Interventional Spine Medicine report dated August 27, 2012 states:

> The onset of low back pain has been sudden and has been occurring in a persistent pattern for 16 years.  The course has been decreasing (since she has retired).  The low back pain is described as a mild to moderate dull aching.  The

6

low back pain is described as being located in the lower
back (left side), left buttock, left upper buttock, left
calf and left dorsal foot.  The pain radiates to the
lateral aspect of left leg (aching) and left foot.  The
back pain is aggravated by bending, twisting, lifting and
sitting (prolonged).  The back pain is relieved by bed rest
(with leg up) and medication.  The symptoms have been
associated with back stiffness, hip pain and leg weakness.
The low back pain was preceded by trauma . . . [t]he pain
interferes with driving, sweeping, gardening, vacuuming and
leisure activities.

In August 2011, Fischer described her low back pain to

Physician's Assistant Ruth Berger as a mild to moderate dull

aching.  Although the pain had been occurring in a persistent

pattern for years, Fischer said, it had been gradually

improving.

Fischer visited Ruth Berger again on June 28, 2012.  She

reported that her pain was aggravated by prolonged sitting and

ascending stairs.  When she stood on her right leg for a few

minutes, it relieved the pain in her left leg.

In August 2012, Fischer again visited Ruth Berger and

described her low back pain as a mild to moderate dull aching.

It had been decreasing since she retired.  Fischer wanted to

discuss removal of her spinal cord stimulation system because

she believed that her pain was controlled with changes in

activities and medication management.

7

On February 13, 2013, Fischer told Physician's Assistant Donna Flynn that her low back pain had been occurring in a persistent pattern for 16 years.  She described the pain as a mild to moderate dull aching.  She also reported that her medications were working well to relieve her pain.

On April 25, 2013, Dr. Braese drafted a letter stating that Fischer had reached maximum medical improvement, that she could barely stand or walk, and that she could do so for no more than two hours at a time.  Dr. Braese also wrote that Fischer had sensory loss, muscle weakness, and positive straight leg raising test.  She also wrote that Fischer could not be very mobile most of the time and that Fischer was unable to lift or work.  Dr. Braese's opinion did not address the extent of Fischer's conditions and limitations at any point in the past, including prior to Fischer's date last insured.

2.    State Agency Opinions

On September 17, 2012, state agency reviewing physician Jonathan Jaffe, MD, reviewed the record and opined that there was insufficient evidence to support an onset date during the period between October 31, 1995, and March 31, 1998.

3.    <u>Fischer's Testimony</u>

Fischer testified at a hearing before Administrative Law Judge (ALJ) Daniel J. Driscoll on May 16, 2013.  She was 55 years old on the day of the hearing, and she had stopped working in January 2011.  She had previously been working part-time a couple of days per week as a hair stylist.  In 1985, Fischer claimed, she had been injured in a car accident.  She had then begun to run a lingerie business, and while working at the business, she fell from an eight-foot ladder onto a concrete floor, injuring her left side.[12]  Fischer was unsure about the date of her injury – she thought it could have been around November 1995.  She explained that she owned her lingerie shop from 1994 until 2003.  She closed the store in 2003 because she could no longer give it her all.  She would go in and lay in the backroom to relieve pain, and the store started to fail because

---

[12] Fischer also referred in her testimony to a 1985 car accident that, she claimed, left her "paralyzed from [her] whole left side."  Tr. at 16, 32-33.  She also testified that after the accident, but before her fall from the ladder, she "got better, a little bit."  Tr. at 33.  The record, however, appears to contain no other reference to any paralysis that Fischer may have sustained from the 1985 accident.  Although Fischer testified that her fall from the ladder "re-injur[ed]" her left side, (Tr. at 16), her claim for disability stems from her fall from the ladder, not from the 1985 car accident or any resulting paralysis.

she could not be there.  She said her daughter helped her to keep the business going, and she had to hire a couple of people as well.  Fischer stated that the business did well for approximately seven years, when she could no longer be there. She was somewhat confused by her earnings record and explained that her former accountant had gone to prison for tax fraud; she thought it was odd that there were several years for which was nothing reported for her.  Fischer stated that she was making approximately $40,000 per year from her shop until she had the spinal implant.  She estimated that she basically did all of the work for her business for approximately three years, until her fall.  She was not sure if she started the business in 1994; she was confident that she closed the store in 2003, and calculated the date she started the business by going back seven years, because she had the business for seven years.  After she fell from the ladder, she closed the store for three days and then made arrangements for her daughter to come in and take over. Afterward, she never again participated in the business full-time.  Fischer stated that after the fall from the ladder, she worked at the store approximately three days per week, and when she was there, she spent most of the time in the back room lying

down.  If she needed to stand up while at the store, she could only stand on her right leg due to her left-sided pain.

Fischer stated that after she closed her store, she went through surgery to have her spinal cord stimulant implanted, and for two years she recuperated from the surgery.  She started doing light work putting together gift baskets, but she found that the bending and lifting was too much, and she was not able to make a living doing it.  She also tried to work part-time as a hair stylist.  She could no longer work because she now spent most of her time in bed.  She woke up in the morning, did a little bit, then went back to lie down with a heating pad.  She then got up and tried to do a bit more before returning to a lying rest position. She testified "most of my day is up and down, up and down."  Her husband does most of the shopping, she said, and she needs to lie down in the back of the car if she is traveling for more than an hour.  She said that her condition was deteriorating.  Fischer denied side effects from her medication and stated that they helped her get up.  She does do some light cooking, she said, but usually does not wash dishes because they are too heavy; climbing stairs is also difficult. Fischer stated that after sitting for more than ten minutes

11

during the hearing, she felt sick to her stomach and her leg was numb.  During a typical day, she spends approximately two hours sitting in a chair, and then two hours lying in a bed, before repeating the cycle.  Fischer stated that her back pain was worse now than it had been in 1997.

A vocational expert also testified at the hearing.  In response to the ALJ's questions, the vocational expert testified that a hypothetical individual with Fischer's age, education, and work experience, who could perform work at the light exertional level, with occasional postural limitations and a need to alternate between sitting and standing, along with additional limitations, could not perform her past relevant work because she required alternate sitting and standing and her past relevant work all involved a lot of standing.  The vocational expert also testified that no job would be available to someone who needed an option to lie down when needed.  In addition, in response to one of the ALJ's hypotheticals, although the vocational expert testified that some jobs may be available, there was no testimony or other evidence offered that those jobs would have been available during the time period at issue, from 1995 to 1998.

4.    The ALJ's Decision

On June 28, 2013, the ALJ issued a decision denying
Fischer's claim for DIB benefits.  At step one, the ALJ found
that Fischer had not engaged in substantial gainful activity
between her alleged onset date of October 31, 1995 and her date
last insured of March 31, 1998.[13]  The ALJ explained that there
was insufficient evidence to determine her actual income or
whether this income represented substantial gainful activity.
The ALJ thus proceeded to step two, where he concluded that
Fischer did not have an impairment or combination of impairments
that significantly limited her ability to perform basic work-
related activities for at least 12 consecutive months prior to
the date her insured status expired on March 31, 1998.
Accordingly, the ALJ found that Fischer was not disabled.

---

[13] Fischer's earnings history both before and after her date last
insured remains unclear from the record.  Some evidence suggests
that Fischer's earnings reports to Social Security did not
reflect her actual earnings while she owned her shop, and
Fischer mentioned that her tax accountant may have caused some
of this confusion.  See Tr. at 18-30.  In any event, neither
party now disputes that March 31, 1998 marks Fischer's date last
insured, and the DIB Insured Status Reports included in the
record confirm that this is the correct date.  See, e.g., Tr. at
157-59.

## II.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

Findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence.  Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion." Id. at 770.  Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts."

14

Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).
The ALJ is responsible for determining issues of credibility and
for drawing inferences from evidence in the record. Irlanda
Ortiz, 955 F.2d at 769. It is the role of the ALJ, not the
court, to resolve conflicts in the evidence. Id.


### III.  **ANALYSIS**

The ALJ denied Fischer's claim at step two of his analysis
by concluding that Fischer's medically determinable impairment,
sciatica, had not become severe as of Fischer's date last
insured. Tr. at 61. The ALJ therefore determined that Fischer
was not entitled to benefits because she was not disabled as of
her date last insured. Tr. at 63. The question raised by this
appeal is whether Social Security Ruling ("SSR") 83-20 required
the ALJ to consult with a medical advisor before reaching that
conclusion.[14] The Commissioner argues that the ALJ did not have

---

[14] Although Fischer did not address the SSR 83-20 issue in her
brief, the Commissioner briefed the issue in detail. See Doc.
No. 9-1 at 10-16. Despite her own decision to brief the SSR 83-
20 issue, the Commissioner argues that I should decline to
address it because Fischer waived the argument by not briefing
it. See id. at 3 n. 2. The cases that the Commissioner cites,
however, do not support that position. Higgins v. New Balance
Athletic Shoe, Inc. establishes only that a litigant may not
raise an argument for the first time on appeal if the litigant

to do so for two reasons: first, because SSR 83-20 requires consultation with a medical advisor only if the ALJ makes an express finding of present disability; and second, because there was insufficient evidence in the record to support any inference that Fischer was disabled as of her date last insured.  See Doc. No. 9-1.  For the reasons I discuss below, I reject both arguments.

## A.   __Applicability of SSR 83-20__

The Commissioner maintains, as she has in the past, that SSR 83-20 should apply only when the ALJ has made an express finding of present disability.  See Doc. No. 9-1 at 10-16.  To support her position, the Commissioner submitted a brief that is nearly identical to her submission in Wilson v. Colvin, a case

did not raise the issue below.  See 194 F.3d 252, 259 (1st Cir. 1999).  That principle does not apply here, however, because the Commissioner has raised the SSR 83-20 issue.  Although it is true that "[t]he district court is free to disregard arguments that are not adequately developed," the Commissioner herself chose to "adequately develop[]" the SSR 83-20 issue by briefing it.  See id. at 260.  Thus, nothing precludes me from deciding an issue where, as here, the party that the issue disfavors elects to brief it.  Cf. U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 446-48 (1993) (circuit court permissibly addressed question not raised by parties after receiving briefing on that question); United States v. Cotterman, 709 F.3d 952, 960 (9th Cir. 2013) (court "may consider an issue that has not been adequately raised on appeal if such a failure will not prejudice the opposing party").

involving the same legal question that I decided in May 2014.
See Wilson v. Colvin, --- F. Supp. 2d ---, 2014 DNH 100; id.
The Commissioner has offered no new arguments that might
persuade me to modify my analysis in Wilson. Because I already
addressed the same arguments in Wilson, I need not repeat my
analysis here. See Wilson, 2014 DNH 100. Thus, as my
colleagues on this Court and I have consistently done before, I
proceed on the premise that SSR 83-20 ordinarily requires the
ALJ to consult a medical advisor before concluding that a
claimant was not disabled as of her date last insured.[15] See,
e.g., id. at 32-34; Rossiter v. Astrue, 2011 DNH 115, 11-13
(Laplante, J.); Moriarty v. Astrue, 2008 DNH 158, 18-19
(McAuliffe, J.); Ryan v. Astrue, 2008 DNH 148, 18-19.

B.   **Ambiguity in the Record**

Even if SSR 83-20 ordinarily requires consultation with a

---

[15] As I explained in Wilson, this general rule does not apply if
either (1) the ALJ expressly determines that the claimant is
either not presently disabled or has not been disabled at any
point through the date of decision, or (2) if the evidence
unambiguously establishes that the claimant was not disabled as
of her date last insured. See Wilson, 2014 DNH 100, 34-35. The
ALJ below made no express finding regarding present disability,
however, and as I discuss in Part B of this section, the record
does not unambiguously establish that Fischer was not disabled
as of her date last insured.

medical advisor before determining that a claimant was not disabled as of her date last insured, the Commissioner further argues, the ALJ was not required to do so here because "there was not enough evidence to support the inference of an onset date".  See Doc. No. 9-1 at 15-16.  I disagree.

It is true that an ALJ need not consult a medical advisor if the record provides unambiguous evidence that the claimant did not become disabled as of the date last insured.  See May v. Soc. Sec. Admin. Comm'r, No. 97-1367, 1999 WL 616196, at *1-2 (1st Cir. Oct. 7, 1997); Bailey v. Chater, 68 F.3d 75 (4th Cir. 1995) (ALJ must consult medical advisor "in all but the most plain cases"); Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995); Wilson, 2014 DNH 100, 24.  This standard, however, permits the ALJ to decline consultation with a medical advisor only if "no legitimate basis [in the record] can support an inference of disability" as of the date last insured.  Mason v. Apfel, 2 F. Supp. 2d 142, 149 (D. Mass. 1998); see, e.g., Mills v. Astrue, 2011 DNH 097, 19 (Laplante, J.) (consultation not required where, aside from one isolated complaint shortly after date last insured, more than four years had passed after date last insured before earliest complaints of impairment).  If such

18

a basis exists, only a medical advisor's expertise can provide the "legitimate medical basis" that SSR 83-20 requires to rebut it.  SSR 83-20, 1983 WL 31249, at *3.

Thus, even a record that furnishes only weak support for a claim remains ambiguous, and therefore requires consultation with a medical advisor, if it could support any legitimate inference of disability prior to the date last insured.  In Rossiter v. Astrue, for instance, only sparse evidence existed that documented the claimant's degenerative condition prior to the date last insured.  2011 DNH 115, 14-18.  Moreover, the claimant's treatment record subsequent to the date last insured suggested that the claimant had at times experienced significant improvement in her condition.  Id. at 15-16.  Nevertheless, this Court concluded that the claimant's treatment records contemporaneous with the date last insured, combined with evidence of deterioration in the claimant's condition subsequent to the date last insured, established sufficient ambiguity in the record to require consultation with a medical advisor.  Id. at 18-20; see also Blea v. Barnhart, 466 F.3d 903, 912 (10th Cir. 2006) (finding ambiguity in record after concluding that evidence did not necessarily establish that claimant had not

become disabled by date last insured).

Applying this standard to the record here, I cannot conclude that the record unambiguously establishes that Fischer was not disabled as of her date last insured.  Fischer sought medical treatment for severe left buttock and left leg pain as early as October 1996, well before her disability insurance expired in March 1998.  Doc. No. 10 at 2.  At that visit, her treating physician diagnosed Fischer with sciatica and prescribed an epidural steroid injection.  Id.  During the hearing before the ALJ, Fischer testified that her work schedule changed "dramatically" after her fall.  Tr. at 40.  On some days, she claimed, she was unable to open the store, and on other days she would "lay down in between [] clients."  Tr. at 40-41.  Fischer continued to complain of worsening leg and buttock pain in 2004, and more frequently beginning in 2010.  Doc. No. 10 at 3-6.  In 2013, Fischer's primary care physician concluded that Fischer suffered from "neuropathic pain . . . of the left leg" and had "reached maximum medical improvement."  Tr. at 758.  At that point, the physician observed, Fischer could "barely stand or walk" and could neither work nor lift.  Id.

Thus, this record suggests that Fischer's medically determinable impairment, sciatica, originated before her date last insured and became progressively more severe through 2013. Although significant gaps exist in Fischer's treatment record and certain evidence, including some of Fischer's own statements, could undermine her claim, this record provides enough evidence to support a reasonable inference that Fischer's sciatica had become severe by her date last insured.[16]  See Rossiter, 2011 DNH 115, 19-20; see also Blea, 466 F.3d at 912-13 (gap in medical treatment insufficient to render record unambiguous under SSR 83-20); Moriarty, 2008 DNH 158, 16 (delay of two years following date last insured before first complaint of impairment insufficient to render record unambiguous under

---

[16] A state agency opinion included in the record documents the conclusion of Dr. Jonathan Jaffe, a non-treating physician, that there was insufficient evidence to conclude that Fischer had become disabled by her date last insured.  Tr. at 51-52.  The physician provided his opinion during the initial stage of Fischer's claim on September 17, 2012, nearly eight months prior to Fischer's hearing before the ALJ and without the benefit of Fischer's testimony.  Tr. at 51-52.  The Commissioner has not argued that Dr. Jaffe's opinion either satisfies SSR 83-20 or independently renders the record unambiguous, and the ALJ's decision makes no mention of the opinion.  Indeed, the ALJ departed from Dr. Jaffe's opinion by determining that Fischer had a medically determinable impairment, sciatica, that arose prior to her date last insured even though Dr. Jaffee concluded that Fischer did not have any medically determinable impairments at that time.  Tr. at 52, 61.

SSR 83-20).

Regardless of the strength or weakness of Fischer's claim, therefore, the ALJ's failure to consult a medical advisor before denying Fishcer's claim was an error of law that requires remand.  See Wilson, 2014 DNH 100, 25.  If substantial evidence in the record ultimately persuades the ALJ to conclude otherwise, he remains free to do so without reaching a finding regarding Fischer's present disability – but, under SSR 83-20 and on this ambiguous record, he must first consult a medical advisor.  See Grebenick v. Chater, 121 F.3d 1193, 1200-01 (8th Cir. 1997) ("[T]he issue of whether a medical advisor is required under SSR 83-20 does not turn on whether the ALJ could reasonably have determined that [the claimant] was not disabled before [her last insured date]."); Ryan, 2008 DNH 148, 20.

## IV.   CONCLUSION

For these reasons, I conclude that the ALJ made legal error under SSR 83-20 by failing to consult a medical advisor before determining that Fischer had not become disabled by her date last insured.  Thus, I deny the Commissioner's motion to affirm (Doc. No. 9) and grant Fischer's motion to reverse or remand

(Doc. No. 8).  Pursuant to sentence four of 42 U.S.C. § 405(g), I remand the case to the Social Security Administration for further proceedings consistent with this decision.[17]

     SO ORDERED.


                        /s/Paul Barbadoro
                        Paul Barbadoro
                        United States District Judge

October 30, 2014

cc:  Christine Woodman Casa, Esq.
     T. David Plourde, Esq.

---

[17] Fischer offered other arguments in favor of remand.  <u>See</u> Doc. No. 8-1.  Because I grant remand on the basis of the ALJ's legal error under SSR 83-20, however, I need not reach Fischer's other arguments.